Laramore, Judge,
delivered the opinion of the court:
Pursuant to House Resolution 520, 84th Congress, 2d session, referring the bill H.R. 4507, plaintiff as the claimant named therein, seeks compensation for 27 or 28 thoroughbred horses, claimed alternatively, part of which were captured by combat troops of the U.S. Army in the vicinity of Donauworth, Germany, on April 25, 1945.
The facts are completely set forth in the findings and will briefly be referred to herein only to the extent necessary.
The primary questions presented are: (1) Whether the plaintiff has a claim against the United States, either legally or equitably, and, if so, the amount thereof; (2) is the defendant entitled- to recover on its counterclaim.
Plaintiff’s position is that he is entitled to recover the value as part owner and authorized agent of the other owners of the 27 or 28 horses taken from his possession and control by the U.S. Army-in Bavaria on April 25, 1945.
For convenience, the horses concerned in plaintiff’s petition filed April 30, 1957, and first amended petition filed February 25,1959, are included in four groupings as follows:
*840 Group A consists of 11 thoroughbred mares shipped to the United States from Bergstetten, Bavaria, Germany, by the U.S. Army, and also 6 thoroughbred mare foals imported in and produced by these imported mares after their arrival. At the time of their capture by the U.S. Army on April 25, 1945, these horses were owned by Admiral Nicolas de Horthy and/or Eugene de Horthy, subject to defendant’s general claim that all horses included in this case were war booty, and also subject to plaintiff’s claim of ownership based upon an alleged partnership agreement with Eugene de Horthy, as hereinafter related in these findings.
Group B includes only a thoroughbred stallion named Taj Akbar, shipped by the U.S. Army from Bergstetten, Germany, to the United States.
Group C consists of 9 thoroughbred mares, 8 of which were shipped by the U.S. Army from Bergstetten, Germany, to the United States, the ninth mare having been imported in and foaled by one of the imported mares after arrival. None of these mares were previously the property of the plaintiff or Admiral de Horthy of Eugene de Horthy. Plaintiff claims to have acquired ownership of these horses from other Hungarian interests after their arrival in the United States by exchange for the 10 horses included in Group D.
Group D consists of 10 thoroughbred mares, allegedly the partnership property of Eugene de Horthy and plaintiff, allegedly released by the U.S. Army at Bergstetten, Germany, and returned to Hungary.
Defendant contends (1) that plaintiff has proved no relevant interest in any of the horses for which compensation is claimed, with the exception of a %0 interest in a stallion, Taj Akbar; (2) title to the horses captured by the U.S. Army on April 25, 1945, properly vested in the U.S. Government and the United States incurred no duty to compensate private owners; (3) that plaintiff has no legal claim against the United States for the reason that his appropriate action is through diplomatic channels and not by. suit in this court; (4) plaintiff’s claim is barred by the statute of limitations; (5) there is no amount equitably due plaintiff.
*841 The horses in question were taken in 1945. The petition herein was filed in 1956. Therefore, any legal claim of plaintiff is obviously barred by the statute of limitations, 28 TJ.S.C. § 2501, which provides:
Every claim of which the Court of Claims has jurisdiction shall be barred unless the petition thereon is filed within six years after such claim first accrues.
However, since the House Eesolution requests a conclusion notwithstanding the statute of limitations, we believe a discussion of other legal aspects of the case is desired. In this connection, while the facts conclusively show that plaintiff’s only interest in any of the horses is a %0 interest in the stallion, Taj Akbar, a more compelling reason exists for denial of any legal claim by plaintiff.
On April 25, 1945, while pressing an attack on the key town of Donauworth, elements of the U.S. Army overran a German Army remount station at Bergstetten, some six miles to the north of Donauworth. Located on this remount station were several hundred horses of excellent breeding stock which had been transported from Hungary to evade the advancing Russian Army. Some were privately-owned horses, others were owned by the Hungarian Government. The horses were accompanied from Hungary to Bergstetten by approximately 225 Hungarian nationals, some of whom wore the uniform of the Hungarian Horse Breeding Service. They were, however, civilians and not military personnel.
The Hungarian Army was actively engaged with the German Army in opposing the American advance through Bavaria. The battle for Donauworth was exceedingly bitter. The German forces had organized a defense perimeter beginning some eight miles north of Donauworth and fought a delaying action which involved extensive fighting at points one to six miles from the remount station at Bergstetten.
As the American Army units advanced through the area at Bergstetten, the station was searched, guards posted, and the Hungarian personnel removed to a detention camp. Subsequently, orders were issued by the field command of the U.S. Army that no horses were to be removed from the station and the Hungarian personnel were returned to the *842 farm to care for them. The Army then, proceeded to provide an efficient water system and feed for the horses and a commissioned officer was placed in charge. The horses captured at the Bergstetten station clearly had a potential for military use.
Thus it is clearly shown by the evidence in this case that the horses involved herein were taken during and as a part of a bitter battle for the city of Donauworth. They were not requisitioned from private owners — no private owners were present, and the horses were located on a German Army remount station. Admittedly, no actual fighting occurred on the Bergstetten farm, 'but the farm was in the area of the U.S. Army’s advance, and said area was in its entirety being defended to the utmost by the enemy. Therefore, the farm, beyond question, was a part of the battlefield. Consequently, the seizure, which occurred while the war was flagrant, was an act of war occurring within the limits of military operations.
Under the principles of international law, private enemy property on the battlefield is not in every case an object of booty. However, it is also an accepted principle of international law that horses taken on the battlefield are objects of booty. As stated in 2 Oppenheim, International Law (Lauterpacht, 7th ed.) at page 406:
Private enemy property on the battlefield is no longer in every case an object of booty. Arms, horses, and military papers may indeed be appropriated, even if they are private property, as may also private means of transport, such as cars and other vehicles which an enemy may make use of.
The above concept is recognized in Article 4 of The Hague Regulations respecting the laws and customs of war, 36 Stat. 2277,2296, which provides in pertinent part:
All their personal belongings, except arms, horses, and military papers, remain their property.
The concept of war booty is also recognized as an exception to the principle enunciated in Article 48 of The Hague Regulations, supra, “that private property cannot be confiscated.” Freeman, General Note on the Law of War Booty, 40 Am. J. *843 Int’l Law 195, 799 (1946); Downey, Captured Enemy Property: Booty of War and Seized Enemy Property, 44 Am. J. Int’l Law, 488-489, 494-495 ; 2 Oppenlieim, International Law (Lauterpacht, 7th. ed.) pp. 401-402, 406-407.
Under these circumstances we think it is clear that title to the horses involved herein vested in the United States as war booty on April 25, 1945, when the horses were captured in a combat operation, and the United States owes no duty of compensation to any private owners, there being no statute, law, or express or implied contract to compensate the owner therefor. Hijo v. United States, 194 U.S. 315 (1904); Cf. Oakes v. United States, 174 U.S. 778 (1899); Juragua Iron Co. v. United States, 212 U.S. 297 (1909).
Inasmuch as we firmly believe that the concept of war booty as discussed above, and/or the statute of limitations, completely disposes of plaintiff’s legal claim, it is not necessary to discuss other defenses of the Government.
The remaining factor in plaintiff’s case is whether or not he has a claim against the United States based upon equitable principles; i.e., a moral obligation of the United States to pay for the seized horses.
Under all the facts and circumstances of the case, we fail to see any reason why the defendant has a moral obligation to pay plaintiff for said horses. In the first place, the facts show that plaintiff was not really the owner of the horses, except as to his interest in the stallion mentioned previously. Secondly, had the United States not seized the horses and cared for them, in all probability the horses would have been destroyed or appropriated by the German Army.
Since plaintiff ultimately purchased most of the horses at public auction for the sum of $16,000, he thereby regained a substantial portion of the horses. The $16,000 paid is only a small part of the cost to the United States for the care and transportation necessary to the preservation of said horses. Thirdly,[1] under Articles 29 and 32 of the Treaty of Peace with Hungary, which became effective September 15, 1947, 61 Stat. 2065, 2125-2127, the United States was given the *844 right to seize, retain, liquidate or take any other action with respect to all property rights and interests which at the coming into force of the Treaty are within its territory and belonging to Hungary or Hungarian nationals. These Articles further provide “the Hungarian Government undertakes to compensate Hungarian Nationals whose property is taken under this Article and not returned to them.” [2]
Article 32 of the Treaty provided that Hungary waived all claims of any kind against the allied and associated powers of which the United States was one, on behalf of the Hungarian Government or Hungarian nationals, arising out of the war or out of action taken because of the existence of a state of war in Europe after September 1,1939. Article 32 further provided a complete bar to all claims of the nature referred to therein. In respect to the above, there can be no doubt but that the claim for the seized horses is covered by these Treaty provisions, and the obligation, if any, is not on the United States to compensate for the taking. We doubt that plaintiff’s claim is unique — in all probability many Hungarian nationals lost property resulting from the ravages of war, but unfortunately that alone cannot create a claim against the United States.
For the foregoing reasons, plaintiff has neither a legal nor equitable claim against the United States.
There remains for our consideration the counterclaim of defendant for the cost of feeding, transportation, etc., of the horses. Since the counterclaim is more in the nature of a set-off against any possible recovery by plaintiff, and since we hold that plaintiff is not entitled to recover, defendant’s counterclaim is accordingly dismissed.
This opinion and the findings of fact, together with the conclusions thereon, will be certified to Congress pursuant to House Resolution 520,84th Congress, 2d session.
It is so ordered.
Need, Justice (Bet.), sitting by designation; Duefee, Judge; MaddeN, Judge; and Jones, Chief Judge, concur.
*845 FINDINGS OF FACT
The court, having considered the evidence, the. report of Trial Commissioner Eoald A. Hogenson, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is the claimant named in House Eesolution 520,84th Congress, 2d Session, which provides as follows:
Resolved, That the bill (H.E. 4507) entitled “A bill for the relief of Hartmann H. Pauly”, together with all accompanying papers, notwithstanding the statute of limitations, be referred to the United States Court of Claims pursuant to sections 1492 and 2509 of title 28, United States Code; and said court shall proceed expeditiously with the same in accordance with the provisions of said sections and report to the House of Eepresenta-tives, at the earliest practicable date, giving such findings of fact and conclusions thereon as shall be sufficient to inform the Congress of the nature and character of the demand, as a claim legal or equitable, against the United States, and the amount, if any, legally or equitably due from the United States to the claimant.
Sec. 2. The United States Court of Claims, in connection with its consideration of the case referred by section 1 of this resolution, shall admit in evidence and consider as evidence such documents and affidavits as are submitted by either party.
The text of H.E. 4507 provides:
A BILL
For the relief of Hartmann H. Pauly.
Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled, That the Secretary of the Treasury is authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to Hartmann H. Pauly, Santa Barbara, California, such sum as may be certified to him by the Secretary of the Army pursuant to section 2 of this Act. The payment of such sum shall be in full settlement of all claims of the said Hartmann H. Pauly against the United States for compensation for the loss of certain thoroughbred horses owned by him which were taken from his possession and control by the United States Army in Bavaria on April 25,1945, and shipped to the United States.
*846 Sec. 2. The Secretary of tbe Army is authorized and directed to certify to the Secretary of the Treasury a sum equal to the fair and reasonable market value (determined as of April 25, 1945) of the. thoroughbred horses which were taken from the possession and control of the said Hartmann H. Pauly by the United States Army in Bavaria on April 25, 1945.
Sec. 3. No part of the amount appropriated in. this Act in excess of 10 per centum thereof shall be paid or delivered to or received by any agent or attorney on account of services rendered in connection with this claim, and the same shall be unlawful, any contract to the contrary notwithstanding. Any person violating the provisions of this Act shall, be deemed guilty of a misdemeanor and upon conviction thereof shall be fined in any sum not exceeding $1,000.
2. For convenience in setting forth these findings, the horses concerned in plaintiff’s petition, filed April 30, 1957, and first amended petition, filed February 25, 1959, are included in four groupings as follows:
Group A consists of 11 thoroughbred mares shipped to the United States from Bergstetten, Bavaria, Germany, by the United States Army, and also 6 thoroughbred mare foals imported in and produced by these imported mares after their arrival. At the time of their capture by the United States Army on April 25, 1945, these horses were owned by Admiral Nicolas de Horthy and/or Eugene de Horthy, subject to defendant’s general claim that all horses included in this case were war booty, and also subject to plaintiff’s claim of ownership based upon an alleged partnership agreement with Eugene de Horthy, as hereinafter related in these findings.
Group B includes only a thoroughbred stallion named Taj Akbar, shipped by the United States Army from Bergstetten, Germany, to the United States.
Group O consists of 9 thoroughbred mares, 8 of which were shipped by the United States Army from Bergstetten, Germany, to the United States, the ninth mare having been imported in and foaled by one of the imported mares after arrival. None of these mares were previously the property of the plaintiff or Admiral de Horthy or Eugene de Horthy. Plaintiff claims to have acquired ownership of these horses *847 from other Hungarian interests after their arrival in the United States by exchange for the 10 horses included in Group D.
Group D consists of 10 thoroughbred mares, allegedly the partnership property of Eugene de Horthy and plaintiff, allegedly released by the United States Army at Bergstetten, Germany, and returned to Hungary.
Plaintiff claims compensation for the 27 horses included in Groups A, B, and C, or in the alternative, for the 28 horses included in Groups A, B, and D. More detailed facts concerning these horses are hereinafter set forth in these findings.
3. Plaintiff is and has been a citizen of the United States since 1952, having been allowed to enter the United States on the German quota of immigration in 1947. He now resides at Santa Barbara, California. Plaintiff was bom in Germany of a German father and an Austrian mother. When he was two years of age, his father died, and plaintiff moved with his mother to her family home at Vienna, Austria. His mother subsequently married a Hungarian Army officer, and plaintiff thereupon became and thereafter remained a Hungarian citizen and national until he acquired citizenship in the United States. He served as a captain in the Austrian Army in World War I and thereafter remained in the service of the Hungarian Army until retired as a major in 1930. Thereafter he was active as a civilian in horse racing affairs and equestrian sports in Hungary, but did not serve in the armed forces. In 1937, he acquired and thereafter operated his own horse breeding farm located about 25 miles from Budapest, Hungary, and his breeding stock by 1944 consisted of 30 thoroughbred brood mares. Plaintiff continued to operate his farm without interference from the German and Hungarian Governments until the occupation of Hungary by Russian forces. In December 1944, the Russians arrested plaintiff at his farm, placed him under house arrest at another location, and thereafter destroyed or disposed of his horses. Plaintiff was detained in Hungary until December 1946 when he was allowed to and did leave the country.
*848 4. Admiral Nicolas de Horthy was the regent or head of the Hungarian Government from 1920 to 1944. Eugene de Horthy was his brother. Both were owners and breeders of Hungarian thoroughbred horses. Eugene held no office or position with the Hungarian Government, civilian or military, but was exclusively engaged in the horse breeding business and allied matters. Because of their mutual interest in such affairs, plaintiff was well acquainted with both Nicolas and Eugene de Horthy.
Both Nicolas and Eugent de Horthy died some time prior to the filing of plaintiff’s petition in this case.
5. Commencing in 1938, Hungary commenced to conform its foreign policy to that of Nazi Germany, and on November 20, 1940, signed the so-called Tripartite Pact, thereby allying itself formally with the Axis powers. On December 11, 1941, when Hungary, as an ally of Germany, was already at war with the United Kingdom and the U.S.S.K., and on which date the United States declared war on Germany, the Hungarian Prime Minister informed the United States Minister in Budapest that the principle of solidarity obliged Hungary to sever diplomatic relations with the United States. On December 13,1941, the Hungarian Government advised the United States through diplomatic channels that Hungary considered that a state of war existed between Hungary and the United States.
The United States refrained from declaring war on Hungary because of the prevailing opinion in the United States that Hungary was acting under German pressure contrary to the desires of the Plungarian people. However, when it became clear that Hungary was giving substantial and effective assistance to the Germans in their attack upon the U.S.S.B.., the United States on June 5, 1942, formally declared war against Hungary.
6. In March 1944, Admiral de Horthy, regent of Hungary, and the Hungarian Chief of Staff, were summoned by Hitler to Berchtesgaden, where demands were made upon them that Hungary increase its participation in the war against the U.S.S.E. After some show of resistance, Admiral de Horthy yielded to Hitler’s demands, and thereafter the occupation and increasing control of Hungary by German *849 forces began. Concurrently with, these events, the American, British, and Soviet Governments in the face of rising indications of Axis defeat were proposing to Axis satellites that they quit the war. Rumania accepted an armistice with the Allies on August 23,1944. Invasion of Hungary by the Russian forces was rapidly approaching. In September 1944, Admiral de Horthy dispatched a Hungarian mission to Moscow to negotiate an armistice with the Allies. On October 15, 1944, he made a sudden public announcement that he had asked the Allies for an armistice and ordered Hungarian forces to cease hostilities. German forces quickly forestalled such measures, and Admiral de Horthy was arrested and removed to Bavaria, Germany. Hungarian pro-Nazis seized power with German support, and Ferenc Szalasi proclaimed himself leader of Hungary and ordered that the fight against the Allies be carried on to the last.
7. From October 15, 1942, through the early weeks in 1945, the German occupation forces and most of the Hungarian Army under German direction fought a'bitter delaying action through Hungary. Substantial Hungarian forces joined with and aided the Soviet advance into Hungary. During this period, the Germans carried on wholesale looting and removal from Hungary into Germany and Austria of grain stocks, livestock, the contents of stores and warehouses, machinery, rolling stock, and public and private property of every sort. Budapest was encircled by Soviet forces by Christmas 1944, but the Germans were not finally cleared therefrom until February 13,1945.
8. On December 23, 1944, the formation of a provisional Hungarian government, sponsored by the Soviet forces, was announced at Debrecen in the Soviet occupied portion of Hungary. The United States had no official relations with this provisional regime, but authorized its ambassador in Moscow to join with British and Soviet representatives in presenting armistice terms to this provisional government.
As required by proposed armistice terms, this Russian-sponsored Hungarian Government declared war on Germany on December 28, 1944. On January 20, 1945, an armistice was signed at Moscow by a representative of the Soviet high command in behalf of the Allies at war with Hungary and by representatives of this Hungarian provisional government.
*850 9. For many years prior to and also during World War II, the Hungarian Government maintained and conducted an extensive program of liorse breeding to increase and improve the quantity and quality of the Hungarian stock of horses. Approximately 900,000 horses existed in Hungary prior to the war, and about 400,000 remained thereafter. Hungary was naturally concerned with development of horses suitable for military use, since the Hungarian Army used horses extensively in World War II and prior thereto, as did Germany, Russia, and other European countries. Basically, however, the Hungarian state program was conducted to insure an adequate supply of horses for agricultural and domestic purposes, and was historically conducted by one division of the Hungarian Ministry of Agriculture. From 1941 to 1944, the chief of this section was Colonel Tibor Pettko-Szandtner, later promoted to general, who served in a civilian rather than a military capacity. Although the Hungarian Ministry of Defense had ultimate authority over the horse breeding program during the war, the Ministry of Agriculture actually supervised the administration of the work. The state employees of the program were civilians who wore uniforms different from the regular uniforms of the Hungarian Army.
10. From November 25, 1944, to December 6, 1944, the Hungarian pro-Nazi Government, with the full cooperation of the German government, shipped some 1,200 Hungarian state-owned and 100 privately owned horses, including those involved in this case, to German Army remount farms located in the vicinity of Donauworth at Neuhof, Kaisheim and Bergstetten, Germany. The horses involved in this case were kept on the Bergstetten farm along with many others. None of these horses, state or privately owned, had been used at any time in any military unit or organization, but were and had been exclusively maintained for breeding purposes. While these Hungarian horses were located on German Army remount farms, there is no evidence that German or Hungarian armed forces were stationed thereon or exercised any direct supervision or control thereof while the Plungarian horses were there. On the contrary, Hungarian personnel carried on operations on these farms just as if they were state breeding farms in Hungary. Approx *851 imately 225 Hungarian men, women and children accompanied these horses from Hungary to Germany and were engaged in the care of them. Pettko-Szandtner, previously mentioned in finding 9, was in direct charge of the Hungarian horses on these German farms, and also present as general supervisor was Paul Battha, who had served as career Secretary of Agriculture, second in authority to the Minister, in the Ministry of Agriculture of Hungary, and who had in that capacity issued the order for the transportation of the horses from Hungary to Germany. All of the Hungarian personnel at the Bergstetten farm were civilian, and some wore the uniform of the Hungarian horse breeding service. Mr. Battha had issued the permit for transportation of the de Horthy horses to Germany. In fact, the de Horthy horses had been previously transported from their breeding farm in eastern Hungary to a state breeding farm in western Hungary to avoid their capture by Russian forces.
11. All of the thoroughbred horses involved in this case and also several hundred state-owned horses were located on the Bergstetten farm in Bavaria, Germany, when possession and control of the farm and the horses were taken by the United States Army on April 25, 1945.
On and prior to that date, the Third and Seventh Armies of the United States were advancing against German forces, supported by units of the Hungarian Army, on a broad front from north to south in Bavaria. As a part of the entire operation, the 42d Infantry Division, Seventh Army, on April 25, 1945, advanced on a ten-mile front through the area in which the Bergstetten farm and the other two farms were located. The- 42d Division then had 807 officers and 13,117 enlisted men. Extensive fighting, involving artillery, mortar and small arms fire, occurred at points located within distances of 1 to 6 miles in all directions from the Bergstet-ten farm. On April 24, 1945, extensive enemy forces were reported in the woods about 2 miles north of the Bergstetten farm, and United States forces conducted artillery bombardment upon them all through the night. The escape route for these enemy forces was the main road to the south, which passed alongside the Bergstetten farm, and after bitter fight *852 ing involving considerable artillery, mortar and flat trajectory fire, the enemy forces withdrew along this road. No fighting occurred on or adjacent to the Bergstetten farm, but the Hungarian attendants were able to hear the artillery and small arms fire and also observed a tank engagement in the distance. One of the stables on the Bergstetten farm was struck and damaged by an artillery bomb, but neither personnel nor horses were injured.
The German forces had been organizing a major line of defense at Donauworth, 6 miles to the south of Bergstetten and had fought a bitter delaying action as far as 8 miles to the north. Actually, a special task force of the 42d Division on April 25, 1945, outflanked the enemy and came into Donauworth from the east and destroyed the enemy’s defenses after 6 hours of heavy fighting. Thereafter on the same day, other units of the 42d Division arrived at Donau-worth and aided in the clearing of the city. The Germans had succeeded in blowing up the bridges over the Danube River at Donauworth, and the 42d Division then established its command post at Buchdorf, 1 mile southeast of the Berg-stetten farm, and began to make plans for the crossing of the Danube.
The Germany Army was planning to make its final stand in the area about Berchtesgaden, in the Bavarian Alps, south of the Danube, and had assembled substantial quantities of materiel and personnel there. Hostilities in Germany continued through May 7, 1945. The German defenses at Munich fell on May 6, 1945, where the troops facing United States Army forces included the Sixth Hungarian Infantry Division.
12. As the 42d Division moved through the area about the Bergstetten farm, United States troops came onto the farm on April 25, 1945, and searched and inspected the premises. They were met by some of the uniformed Hungarian personnel who explained that they were civilian employees of the Hungarian Ministry of Agriculture and that the horses were breeding stock belonging to the Hungarian Government. American troops were posted to guard the farm, and the uniformed Hungarian personnel were removed to a detention camp. Competent orders were thereafter issued *853 by the pertinent field command of the United States Army that no horses were to be removed from the Bergstetten farm until further order, and the Hungarian caretakers were returned to the farm to care for the horses. A commissioned officer of the United States Army was placed in charge of the farm and the horses, and the Army proceeded to restore an efficient water supply and provide feed for the horses.
13. About 300 of the Hungarian state-owned horses transported from Hungary to Germany were purebred draft horses, and were kept on the remount farm at Kaisheim where the United States Airny also came into possession of them. All of the several hundred horses on the Bergstetten farm were light-weight horses of the riding type, not suitable for heavy work, but excellent stock for breeding purposes. In view of their value for such purposes, it was unlikely that they would be used in the armed forces except in circumstances of urgent need. In view of the rapidly declining fortunes of the German forces, it was reasonable to believe that had they thereafter recovered possession of these horses, they quite likely would have used them in future military operations. The evidence is clear that these horses were not used, but could have been used in military operations.
14. On August 21, 1945, Col. Fred L. Hamilton, Chief of the Army Bemount Service, was ordered by the United States War Department to proceed from the United States to Europe for the purpose of inspecting and selecting breeding stock from captured enemy dogs and horses for transfer to the United States to supply the Army breeding program. Colonel Hamilton visited various German remount breeding farms throughout the part of Germany occupied by the United States Seventh Army, and also went to the Bergstetten farm which was then under the control and supervision of Major Owens, remount officer of the United States Third Army. Colonel Hamilton learned that some of the many Bergstetten horses had been privately owned but was led to believe that they had been surrendered by their private owners to the Hungarian Government. He considered it practically impossible to trace individual *854 ownership, and, in any event, considered that all of the Bergstetten horses were legitimate war booty.
As a result of selections and arrangements made by Colonel Hamilton, the first shipment of horses from Germany arrived in the United States on October 21, 1945. The total shipment comprised 150 horses, of which 77 were Hungarian.
On May 15, 1946, Colonel Hamilton was again ordered by the War Department to proceed to Germany for the purpose of effecting final disposition of captured horses and to select and ship to the United States those considered suitable for use in the Army horse-breeding program. On this trip, Colonel Hamilton selected a second group of 84 horses, 28 of Hungarian origin, and these horses arrived in the United States on July 27, 1946. The total of the horses shipped to the United States from Germany was thus 234, of which 105 were Hungarian horses.
On the basis of his recommendations, about 350 Hungarian horses still in the possesssion of the United States Army at Bergstetten were returned to Hungary. The return of these horses to Hungary resulted from a request which had been previously made by the Hungarian Minister in a conference with Col. Hamilton at Washington, D.C.
15. Plaintiff testified in this case that about March 19, 1944, Eugene de Horthy had about 30 thoroughbred brood mares on his farm in eastern Hungary, and that plaintiff had about the same number on his farm near Budapest. Plaintiff testified that he and Eugene de Horthy had a discussion concerning the risk of loss of their horses due to current and future war conditions, that they orally agreed that Eugene de Horthy would endeavor to take his horses to Germany to avoid their possible capture by Bussian forces, that plaintiff would incur the risk of keeping his horses on his farm in Hungary, and that whatever happened to the horses at either location, plaintiff and Eugene de Horthy would share in equal interests whatever horses remained after the war.
The time of this alleged agreement was when Admiral de Horthy and Hitler held their conference at Berchtes-gaden, as related in finding 6, and when the occupation of *855 Hungary by German forces began. Some of the horses on the de Horthy farm belonged to Admiral de Horthy. Eugene de Horthy was managing the entire operation on this farm. Plaintiff admits that he had no discussion or conversation with Admiral de Horthy concerning sharing of the horses.
At the time of the transportation of the Hungarian horses from Plungary to Germany, Admiral de Horthy was a prisoner of the Germans, being held under house arrest in Bavaria, Germany. According to a letter dated July 2, 1946, written by Eugene de Horthy to United States authorities at Munich, Eugene was arrested by the Germans on January 2, 1945, and held by them at Hirschberg, Bavaria, until his liberation by the United States Army. In this letter, Eugene explained that his mares had been transported with state-owned horses from Hungary to Germany on order of the Hungarian authorities in charge of the Hungarian state breeding farm because sufficient fodder and personnel would not be left behind to care for the privately owned horses. Eugene de Horthy further explained that it would have been senseless to protest removal of his horses anyhow. He made no mention of any interest of plaintiff in his horses, but asserted that he was prepared to show that he was the legal owner.
16. On February 28, 1947, the Hungarian Government submitted a claim to the United States State Department for restitution of the 105 Hungarian horses, and their offspring, which had been shipped by the United States Army from Germany to the United States. On November 25,1947, while the claim was still pending in the State Department, the Senate Committee on Armed Services appointed a subcommittee to investigate the matter. Hearings were held, involving meetings on ten different days, after which the subcommittee reported to the full committee that the horses should not be returned to the Hungarian Government. In support of its recommendation, the subcommittee found and concluded that the Hungarian horses were captured enemy war materiel as defined in applicable sections of the Buies of Land Warfare, and that the United States Army acted entirely within its legal rights in shipping these horses to the *856 United States. Tbe subcommittee considered that articles 29 and 82 of the Treaty of Peace with Hungary, effective September 15, 1947, were entitled to great weight in determining the issues involved in the matter. The recommendations of the subcommittee were approved by the Committee on Armed Services on January 13,1948, and the Committee advised the Secretary of the Army that in its opinion the United States had the right as a matter of fact and as a matter of law to retain the horses.
The State Department and the War Department thereupon agreed that the horses would not be returned to Hungary, but would be retained by the Army as property of the United States.
17. Articles 29 and 32 of the Treaty of Peace with Hungary, which became effective September 15, 1947, provided as follows:
ARTICLE 29 '
1. Each of the Allied and Associated Powers shall have the right to seize, retain, liquidate or take any other action with respect to all property, rights and interests which at the coming into force of the present Treaty are within its territory and belong to Hungary or to Hungarian nationals, and to apply such property or the proceeds thereof to such purposes as it may desire, within the limits of its claims and those of its nationals against Hungary or Hungarian nationals, including debts, other than claims fully satisfied[1] under other Articles of the present Treaty. All Hungarian property, or the proceeds thereof, in excess of the amount of such claims, shall be returned.
2. The liquidation and disposition of Hungarian property shall be carried out in accordance with the law of the Allied or Associated Power concerned. The Hungarian owner shall have no rights with respect to such property except those which may be given him by that law.
3. The Hungarian Government undertakes to compensate Hungarian nationals whose property is taken under this Article and not returned to them.
‡ ‡ $
ARTICLE 32
1. Hungary waives all claims of any description against the Allied and Associated Powers on behalf of *857 the Hungarian Government or Hungarian nationals arising directly out of the war or out of actions taken because of the existence of a state of war in Europe after September 1, 1939, whether or not the Allied or Associated Power was at war with Hungary at the time, including the following:
(a) Claims for losses or damages sustained as a consequence of acts of forces or authorities of Allied or Associated Powers;
(b) Claims arising from the presence, operations or actions of forces or authorities of Allied or Associated Powers in Hungarian territory;
*****
(d) Claims arising out of the exercise or purported exercise of belligerent rights.
2. The provisions of this Article shall bar, completely and finally all claims of the nature referred to herein, which will be henceforward extinguished, whoever may be the parties in interest. * * *
18. Included among the 105 Hungarian horses shipped by the United States Army to the United States were the 11 thoroughbred mares included in Group A in these findings. These mares were part of the many Hungarian horses kept on the Bergstetten farm. Three of these horses belonged to Admiral de Horthy, and the other eight to Eugene de Horthy. Two of the eleven mares were necessarily destroyed in the United States by the Army because of their illness, and the other nine were sold at public auction by the United States to private purchasers.
The names, year of foal, date of auction sale or death, prior owner, and price received by the United States on the auction sales of these eleven mares are as follows:
Group A Mares Tear foaled Date of sale or death Prior owner Price paid at auction
Borura Deru__ 1933 10-19-48 Admiral de Horthy. $200
Pietrosz_ 1939 10-19-48 Admiral de Horthy. 975
Dicseret. 1937 10-21-46 Admiral de Horthy. 460
Merga_ 1939 10-21-46 Eugene de Horthy.. 1,100
Penang II_ 1933 10-19-48 Eugene de Horthy.. 900
Barbara. 1937 10-21-46 Eugene de Horthy.. 450
Lady Pbalaris. 1929 10-19-48 Eugene de Horthy.. 675
Sarasvati. 1936 5-25-49 Eugene de Horthy.. 775
Vendetta. 1938 10-19-48 Eugene de Horthy. . 675
Mitugralsz.... 1937 9- 2-48 Eugene de Horthy. . ([1])
Melvyn_ 1936 7-31-46 Eugene de Horthy.. ([1])
*858 Plaintiff was the purchaser at the auction sales of the horses named Borura Deru, Pietrosz, Penang II, and Sara-svati. Plaintiff later acquired from the auction sale purchasers, Dicseret for $500, Merga for $1,500, Barbara for $1,000, and Lady Phalaris for $1,500. He did not acquire Vendetta.
19. Breeding operations on the Bergstetten farm continued after the horses were taken by the United States Army on April 25,1945, and six of the mares in Group A produced six thoroughbred mare foals after their arrival in the United States, all foaled in 1946. These foals were also sold at auction by the United States to private purchasers. The names of these foals, the name of the dam of each, the prior owner of the dam, the date of sale at public auction, and the price received by the United States at such auction are as follows:
Group A foals Bam Prior Owner of Bam Auction Sale Price paid at Auction
Banube. Borura Beru... Admiral de Horthy.. 10-21-46 $1,000
Pity. Pietrosz_. Admiral de Horthy. 10-21-46 600
Busciness. Sarasvati. Eugene de Horthy.. 10-19-48 1,250
Mitugralsz XI. Mitugralsz. Eugene de Horthy.. 10-19-48 1,025
Pbalady. Lady Phalaris.. Eugene de Horthy.. 6- 3-49 750
Waldemar. — . Barbara.... Eugene de Horthy.. 10-19-48 1,600
Plaintiff was the purchaser at the auction sales of Danube, Pity, Dusciness, and Mitugralsz II. He did not acquire Phalady and Waldemar.
20. Plaintiff’s claim of a partnership interest in the de Horthy horses is strongly rebutted by various facts and circumstances in evidence. Although valuable property was involved, no written agreement or memorandum was prepared or executed by the purported parties. Although the partnership agreement was supposedly made in March 1944, all eight of the mares of Eugene de Horthy, listed in finding 18, were on October 26, 1944, set forth in the Hungarian Racing Calendar as being the property of Eugene de Horthy, without any mention of plaintiff. The Hungarian Racing Calendar was a publication containing thoroughbred racing and breeding news and provided horse owners with a medium to publish information about their thoroughbred *859 horses. On. December 1, 1944, Admiral de Hortby was named in the Hungarian Pacing Calendar as owner of the other three mares (see finding 18) without any mention of plaintiff. On December 15, 1944, plaintiff’s horses were listed in the Hungarian Pacing Calendar without mention either of the horses involved in this case or acknowledgment that Eugene de Horthy had any interest in his horses. On July 2,1946, Eugene de Horthy addressed a letter to United States Army authorities at Munich, Germany, concerning his horses which had been transported from Hungary to the Bergstetten farm and there taken by the United States Army. In this letter, Eugene de Horthy asserted that some of these horses belonged to him and others to Admiral de Horthy, but made no mention of any right or interest of plaintiff. These and other circumstances in evidence preponderate against any finding that an oral partnership agreement was made.
In December 1948, Eugene de Horthy did write the following memorandum at Paris, France, which was forwarded by a French racing society to plaintiff in the United States:
Undersigned Eugene de Horthy declare herewith, that Mi'. Plartmann Pauly is partowner and full author-ised [sic] agent of my mares Vendetta, Lady Phal-aris, Sarasvati, Penang II, Merga, Mitugralsz, Melvyn and Barbara, also of there [sic] foals rebought, borne in U.S. My brother Adm. de Horthy’s mares [his pseudonym Kenderesi menes] Borura deru and Piet-rosz are also in partownership mentioned above and Mr. Pauly is also there [sic] full authorised agent. These mares are and were managed by myself.
[s] EtxgeNe be HoRTHY
Paris Dec. 1958
This document is not found to be a confirmation of any former understanding or agreement had between Eugene de Horthy and plaintiff, but rather a document prepared to enable plaintiff to have legal standing to deal with the horses in the United States. As otherwise stated in these findings plaintiff had acquired some of the horses involved in this case either at the auction sales or from other purchasers, and plaintiff was endeavoring to have the American Jockey Club acknowledge and register them as *860 recognized thoroughbreds. In fact, plaintiff in 1947, caused a statement by the Hungarian Jockey Club to be filed with the American Jockey Club to the effect that Nicolas and Eugene de Horthy were the registered owners of the mares, those included in Group A hi these findings, and that there was no change of ownership prior to their seizure by the United States Army on April 25,1945.
From all of the evidence in this case, it is concluded that plaintiff had no right, title, or interest in any of the horses listed in Group A in these findings at the time of their seizure by the United States Army on April 25, 1945, at the Bergstetten farm in Bavaria, Germany.
21. Only one horse is listed in Group B in these findings, a thoroughbred stallion named Taj Akbar. This horse was foaled in 1938, and was originally the property of the Aga Khan. Plaintiff arranged for the purchase of this horse in 1939, and it then became the property of a Hungarian syndicate comprised of 40 persons, and title was held for the syndicate by the so-called Committee of Nine headed by Eugene de Horthy. Plaintiff owned two shares, or a %0 interest. Eugene de Horthy owned 4 shares, or a %0 interest. On or about November 21,1958, plaintiff acquired an additional share, or %o interest from Count Sigmund Berchtold. There is no evidence as to who were the other shareholders. Taj Akbar was on the Bergstetten farm when possession and control was taken by the United States Army on April 25,1945, and was among the horses shipped by the Army to the United States. This stallion was sold by the defendant at public auction on October 25,1949, for the sum of $3,150, and the purchaser was plaintiff in the name of his wife.
The evidence in this case establishes that on April 25, 1945, plaintiff had 2 shares, or a %0 interest, in the stallion Taj Akbar.
22. Also included in the 105 Hungarian horses brought to the United States were 8 thoroughbred mares, which for convenience are included in Group C in these findings, along with the thoroughbred foal imported in and produced by one of these 8 mares. These horses were among all the others seized on the Bergstetten farm. All 9 of these mares *861 were sold by tire United States at public auction. With respect to these horses, the names, year of foal, date of sale, owner when taken by the United States Army, and auction price received by the United States are as follows:
Group 0 mares Year of foal Date of auction sale Prior owner Auction price paid
Pax_ 1937 10-21-46 Bela Halasz. $1,200
Blaze_ 1946 10-21-46 (foal of Pax)-350
Paradian_ 1932 10-19-48 Bela Halasz_ 625
Paradise..,. 1944 10-19-48 Bela Halasz_ 650
Tatika_ 1939 10-19-48 Hungarian Govt. 1,000
Bellagio_ 1937 5-26-49 Hungarian Govt. 600
Star Dancer. Mami_ 1934 1942 10-21-46 10-19-48 Hungarian Govt. Bela Halasz.. 1,300 1,700
Zula. 1934 10-19-48 Paul Battha. 786
Neither plaintiff nor Admiral de Horthy nor Eugene de Horthy had any right, title or interest in any of these horses at the time of their seizure on the Bergstetten farm or subsequent shipment to the United States. Plaintiff was the purchaser of Paradian, Paradise, Tatika, and Bellagio at the public auctions. Plaintiff also acquired from the original auction sale purchasers Pax for $1,500, Blaze for $350, and Star Dancer for $1,000. Plaintiff did not acquire either Mami or Zula.
Plaintiff claims that he and Eugene de Horthy as co-owners in equal shares had acquired title to these horses after their arrival in the United States by exchanging these 9 horses for the 10 horses listed in these findings in Group D. The evidence is insufficient to establish any such exchange of horses.
23. The Group D horses in this case were 10 thoroughbred mares which were never shipped to the United States, but were among the horses seized on the Bergstetten farm by the United States Army on April 25, 1945. The prior owner of 9 of these horses was Eugene de Horthy, and their names and year of foal were as follows: Kevely, 1935; Parma, 1936; Dekadens, 1940; Devisa, 1931; Dhaka, 1936; Dorna, 1930; Dubiosa, 1941; Cagnotte, 1935; and Tipsy Pudding, 1935. The prior owner of the tenth horse was Admiral de Horthy, and the name and year of foal was Plaster Saint, 1934.
The evidence is uncertain as to what happened to these horses, but it is reasonable to conclude that they were among *862 the 350 Hungarian 'horses released by the United States Army through action of Colonel Hamilton at the Bergstetten farm for return to Hungary. Plaintiff’s claim that Eugene de Horthy protested the release of these horses for return to Hungary is not supported by substantial evidence. The evidence is insufficient to establish that plaintiff ever acquired any interest in these horses by any partnership agreement between him and Eugene de Horthy. Plaintiff’s claim that these 10 horses were exchanged for the 9 horses, included in these findings in Group C, is not supported by substantial evidence.
From all of the evidence in this case, it is found that plaintiff had no right, title, or interest in these Group D horses at the time of their taking by the United States Army on April 25,1945, at the Bergstetten farm in Bavaria, Germany.
24. The only horse involved in this case, in which plaintiff had any right, title or interest at the time of the taking of the horses by the United States Army on April 25,1945, was the stallion Taj Akbar. In 1939, plaintiff and his associates in the syndicate paid the Aga Khan 240,000 Swiss francs, or $53,816.88 for this stallion, at a time when he was six years old and had recently placed second in the Epsom Derby. In 1945, Taj Akbar was 12 years of age, and under the circumstances existing at the time, it is reasonable to conclude that the fair and reasonable value of this stallion on April 25, 1945, was the sum of $25,000. Plaintiff’s interest at that time was a 2/40 share, or $1,250.
25. With respect to defendant’s counterclaim, the evidence is insufficient to determine the extent to which defendant incurred expenses for the care, subsistence or transportation of any or all of the horses involved in this case.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the defendant is not entitled to recover on its counterclaim and it is, therefore, dismissed.

 While Articles 29 and 32 undoubtedly create a legal bar to plaintiff’s claim, we think it also bears upon the equitable aspects of this case.

 Plaintiff did not come to this country until 1947 and filed his intention to become a citizen in 1948. Therefore, not only at the time of seizure, but also on the date of the Treaty of Peace, supra, plaintiff was a Hungarian national.

 Destroyed.